cL

ORDERED in the Southern District of Florida on April 23, 2009.



A. Jay Cristol, Chief Judge Emeritus
United States Bankruptcy Court

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION
### www.flsb.uscourts.gov

In re:

OCEAN BLUE
LEASEHOLD PROPERTY LLC, et al.[1]

     Debtors.
_____/

CASE NO. 07-17999-BKC-
Jointly administered

Chapter 11

## MEMORANDUM ORDER GRANTING IN PART SREI-MIAMI, LLC'S MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. § 503 (b)

THIS CAUSE came before the Court for hearing on December 23, 2008 at 2:00 p.m. upon the Motion of SREI-Miami, LLC ("SREI") for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b) (the "Motion") [D.E. No. 650], and the objection thereto (the "Objection") [D.E. No. 672] filed by Legg Mason Real Estate CDO I, LTD ("Legg Mason").

---

[1] The last four digits of the taxpayer's information for each of the Debtors follow in parentheses: Ocean Blue Leasehold Property, LLC (5600); Ocean Blue Fee Owner, LLC, a Delaware limited liability company (5757); Ocean Blue Leasehold Mezzanine, LLC, a Delaware limited liability company (5686); and Ocean Blue Fee Mezzanine, LLC (5814).

MIAMI 464598.13

The principal issues before the Court are whether the Inter-creditor Agreement between SREI and Legg Mason bars SREI's administrative expense claim and, in the event that the Inter-creditor Agreement does not bar the claim, whether SREI's efforts in connection with the Joint Consolidated Plan of Reorganization Proposed by SREI and Drew M. Dillworth as Chapter 11 Trustee [D.E. 366], Disclosure Statement in Support of the Joint Plan [D.E. 369] and supplement thereto [D.E. 388] provided a substantial contribution to the estate.

SREI seeks legal fees of $78,694.50 and expenses of $1,568.68, a total of $80,263.18, for its efforts. It argues that its efforts provided a substantial contribution to resolution of the Debtors' cases by "working cooperatively with the Trustee to bring finality to these cases" and proposing a plan, ultimately confirmed, that materially contributed to and benefited the estates. Motion ¶ 14.

For the reasons set forth below, the Court concludes SREI's claim is not barred by the Inter-creditor Agreement with Legg Mason. Further, the Court believes that SREI may be entitled to an allowed administrative expense claim under 11 U.S.C. §503 (b), though not necessarily in the amount requested, based upon a substantial contribution to the estates, if proven.

## **THE FACTS**

The facts are not disputed.

Legg Mason provided mortgage financing to the fee owners, Ocean Blue Fee Owner, LLC and to the entity which owned a leasehold interest, Ocean Blue Leasehold, LLC for the purchase of the office building owned by the estates. SREI provided mezzanine financing to the Debtors Ocean Blue Leasehold Mezzanine, LLC and Ocean Blue Fee Mezzanine, LLC who in turn owned the membership interests in Ocean Blue Fee Owner, LLC and Ocean Blue

Leasehold, LLC. SREI had no interest in the real estate or in the entities which owned the real estate.

### 1. The Inter-Creditor Agreement

As is not uncommon in connection with transactions such as this involving sophisticated real estate lenders, Legg Mason and SREI entered into an Inter-creditor Agreement, Exhibit "A" to the Objection, D.E. 672. The Inter-creditor Agreement spells out the respective rights and obligations of Legg Mason and SREI. The Inter-creditor Agreement provides that SREI has no interest in the real property and that its loan is subordinate in all respects to the interests of Legg Mason.

SREI enjoyed several key benefits under the Inter-creditor Agreement. The Inter-creditor Agreement allowed SREI the right to cure defaults by the borrowers pre-bankruptcy. Inter-creditor Agreement Section 11(a), pp. 19-20. Also, Section 13 of the Agreement gave SREI the right to purchase Legg Mason's loan.

In exchange for these rights, Legg Mason and SREI agreed that the:

> Mezzanine Lender shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by setoff, counterclaim or otherwise) from Borrower and/or from the premises prior to the date that all obligations of Borrower to Senior Lender under the Senior Loan Documents are paid. If a proceeding shall have occurred . . . Senior Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to Senior Lender before Mezzanine Lender is entitled to receive any payment on account of the Mezzanine Loan.

Inter-creditor Agreement Section 9(a), pp. 16-17. The Agreement further provides that Mezzanine Lender shall not ". . . commence any action or file any motion, claim, obligation, notice or application or take any other action in any Proceeding by or against the Borrower or any SPE Constituent Entity without the prior consent of Senior Lender..." and provides that

SREI ". . . shall not take any action which is adverse to Senior Lender's [Legg Mason] enforcement of its claim." Inter-creditor Agreement Section 10(d), p. 19.

### 2. SREI's Contribution to the Joint Plan and Disclosure Statement

SREI alleges that it expended "considerable resources and efforts towards formulating, drafting, negotiating, and soliciting" the Joint Plan and Disclosure Statement. Motion ¶ 6. Beginning in May 2008, SREI in conjunction with, and after having received approval from, the Chapter 11 Trustee, formulated, drafted and negotiated the Joint Disclosure Statement, the Joint Plan and the Supplement that this Court ultimately approved and confirmed.[2] The Joint Disclosure Statement, the Joint Plan and Supplement address the administration of the Debtors' estates as a whole.

The Plan documents implemented a three-pronged approach for the orderly administration of these cases. Phase I of the Plan provided for the Chapter 11 Trustee's sale of the Debtors' assets for a minimum total purchase price of $27,000,000. When it became obvious that a Phase I sale could not be consummated with the then-chief interested party, the Related Group, the Trustee elected to proceed under Phase II of the Plan.[3]

Under Phase II of the Joint Plan, SREI, through a newly formed entity named Newco, had the opportunity to infuse a capital contribution to the estates sufficient to satisfy administrative and priority tax claims in return for the equity interests in OBLM and OBFM. However, according to SREI, the collapse of the capital markets and the local real estate market led SREI to conclude that the funding required by it to acquire control of the Debtors under

---

[2] *See* Order Approving Disclosure Statement [D.E. No. 369] and Order (1) Confirming Chapter 11 Plan. Drew M Dillworth Named as Disbursing Agent; (2) Scheduling Post-Confirmation Status Conference; (3) Setting Deadlines to file Administrative Claims and Post-Confirmation Final Professional Fee Claims; (4) Extending Time to Assume or Reject Debtor's [*sic*] Executory Contracts and Unexpired Leases [D.E. No. 591].
[3] *See* Notice of Election of Phase II of the Joint Consolidated Plan of Reorganization Proposed By SREI-Miami, LLC and Drew M. Dillworth as Chapter 11 Trustee [D.E. No. 366].

Phase II of the Joint Plan was no longer a viable strategy. When SREI indicated to the Trustee it would not proceed to fund a capital contribution, pursuant to the Joint Plan documents, the Trustee implemented the next step in the Joint Plan and offered the property to Legg Mason.

On November 3, 2008, the Trustee filed his Motion for Sale of Substantially All of the Real and Personal Property of the Estate Pursuant to Phase II of the Confirmed Joint Plan of Reorganization [D.E. No. 620] (the "Sale Motion"), and on November 13, 2008, the Court entered an order granting the Sale Motion [D.E. 626] (the "Sale Order").

As provided by the Joint Plan, the Sale Motion, and the Sale Order, Legg Mason agreed to satisfy all allowed administrative claims and certain real property taxes and thereafter acquire the assets of the Debtors, OBFO, and OBLP by way of credit bid. Pursuant to the Sale Order, the effective sale price of the transaction was valued at approximately $24 million when factoring in the amount of Legg Mason's secured claim, the outstanding ad valorem property taxes that were assumed by Legg Mason, and the estimated administrative claims to be paid. At the December 23, 2008 hearing on the Motion and Objection, counsel for Legg Mason represented that all of the administrative expense claims have been paid except for the substantial contribution claim of SREI.

At the hearing on December 23, 2008, SREI urged that the $80,263.18 in fees and expenses it incurred solely in connection with the Joint Plan and Disclosure Statement substantially benefited the estate by allowing Legg Mason to acquire the property free from state transfer taxes pursuant to 11 U.S.C. § 1146.[4] Hearing Transcript at 9-10.

---

[4] SREI estimates that this transfer tax exemption saved Legg Mason either $126,000 or $261,000, depending on whether the current Miami-Dade County transfer tax of $1.05 per $100.000 of property value is based on the $12 million value assessment by the Miami-Dade County Property Assessor, or the $22 million value estimated for the amount of SREI's debt.

## ANALYSIS

Legg Mason argues that SREI contractually agreed not to take action adverse to Legg Mason through the Inter-creditor Agreement, and is consequently barred from raising the motion for an allowed administrative claim. Legg Mason also argues that SREI's activities did not constitute a substantial contribution to the estate because they did not substantially increase funds available to all creditors and retarded the progress of the liquidation of the collateral.

### A. **THE INTER-CREDITOR AGREEMENT DOES NOT BAR SREI'S CLAIM**

The Court believes the Inter-creditor Agreement is an agreement of subordination, "enforceable in a case under the Bankruptcy Code to the same extent that such agreement is enforceable under applicable non-bankruptcy law." 11 U.S.C. §510(A). Subordination agreements provide that in the event of a default or bankruptcy, the senior creditor will receive repayment in full before the junior creditor receives any payment. *See Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.)*, 156 F.3d 1114, 1118 (11th Cir. 1998). Under the Bankruptcy Code, subordination commonly refers only to the priority of distribution.

Several federal courts agree and interpret "subordination" in section 510(a) to only implicate the priority scheme in bankruptcy. *See, e.g., HSBC Bank v Branch (In re Bank of New England Corp.)*, 364 F. 3d 355, 361 (1st Cir. 2004); *In Re Hinderliter Indus., Inc.*, 228 B.R. 848, 850 (Bankr. E.D. Tex. 1999); *In re Bet Prods. Co., Inc.*, 168 B.R. 35, 71 (Bankr. S.D.N.Y. 1994); *In re Henzler Mfg. Corp.* 36 B.R. 303 (Bankr. N.D. Ohio 1984); *Beatrice Foods Co. v. Hart Ski Mfg. Co., Inc. (In re Hart Ski Mfg. Co., Inc.)*, 5 B.R. 734, 736 (Bankr. D. Minn 1980); *but cf. In re Curtis Ctr. Ltd. P'ship*, 192 B.R. 648, 660 (Bankr. E.D. Pa. 1996) (assuming, in dicta, that the voting provision in subordination agreement assures that a senior creditor controls

the junior creditor's ballot, but qualifying its decision by stating, "[n]o argument to undercut the efficacy of the subordination agreement or the applicability of above § 510(a) has been offered").

Moreover, the meaning attributed to "subordination" under secured transaction law relates only to priority. Section 510(a) holds subordination agreements enforceable to the same extent such agreements are "enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). The applicable nonbankruptcy law pertaining to secured transactions is Article 9 of the Uniform Commercial Code which provides: "Nothing in this Article prevents subordination by agreement by any person entitled to priority." U.C.C. § 9-316; *see also Robinson v. Howard Bank (In re Kors, Inc.)*, 819 F.2d 19, 24 (2d Cir. 1987) (citing Vermont U.C.C. § 9-316 and noting section 510(a) enables creditors to subordinate their priorities by agreement). By subordinating its claim, a subordinated creditor agrees to lower its priority to below that of the senior creditor for purposes of distribution with respect to a particular transaction.

While the Court believes the Inter-creditor Agreement in this case affects only the rights of the parties in bankruptcy regarding payment priority of the underlying debt obligations, the Court will nonetheless address Legg Mason's argument that SREI is barred from seeking reimbursement of legal fees and expenses incurred while providing a substantial contribution to these Chapter 11 cases, assuming such contribution is proven. Legg Mason relies on the following language in Paragraph 9(a) of the Inter-creditor Agreement as a bar to SREI's claim for administrative expenses:

> Mezzanine Lender shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by setoff, counterclaim or otherwise) from Borrower and/or from the premises prior to the date that all obligations of Borrower to Senior Lender under the Senior Loan Documents are paid. If a proceeding shall have occurred . . . Senior Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to

> Senior Lender before Mezzanine Lender is entitled to receive any
> payment on account of the Mezzanine Loan.

The Court does not consider this language a bar to SREI's claim for expenses due it for services rendered on behalf of the Debtors' estates. First, with the Trustee's sale of the Property to Legg Mason for a credit bid in the full amount of Legg Mason's claim, Legg Mason has effectively been paid in full. Therefore, no bar exists to any payment to SREI as the Mezzanine Lender. Second, the operative language, "on account of the Mezzanine Loan," and the language directly following the above-quoted language that, "all payments or distributions *upon or with respect to the Mezzanine Loan* which are received by Mezzanine Lender shall be received and held in trust by the Mezzanine Lender for the benefit of Senior Lender . . . .", does not bar recovery by SREI either. *See Inter-creditor Agreement*, Sec. 9(a). SREI will not receive a payment *upon or with respect to the Mezzanine Loan* if awarded its claim for administrative expenses. SREI will receive payment on *account of or with respect to the "substantial contribution"* provided to these Chapter 11 cases in formulating, drafting, and negotiating the confirmed Joint Plan and Joint Disclosure Statement.

Moreover, it is important to clarify that SREI's administrative expense claim arises as a matter of federal bankruptcy law, under section 503(b) of the Bankruptcy Code. Any claim asserted by SREI is against the Debtors' bankruptcy estates for payment, not Legg Mason. It just so happens that in this instance, the same creditor seeking an award of legal fees and expenses from the estate, also happens to be a party to an Inter-creditor Agreement with the entity that obligated itself to pay such allowed administrative expense claims. The Inter-creditor Agreement fixes these parties' rights as a matter of state law as to which entity should be subordinated to the other in terms of repayment of the debt obligations owed to them by the various Debtors. As such, the Court does not find SREI is in breach of the Inter-creditor

Agreement by its request for an administrative expense claim as such request does not implicate issues of priority of payment.

Legg Mason further argues that SREI's administrative expense claim is barred pursuant to Section 10(d) of the Inter-creditor Agreement, which states that SREI "shall not take any action which is adverse to Senior Lender's enforcement of its claim." As with the prior provision relied upon by Legg Mason, a reading of the entire provision gives added context to this alleged prohibition. Section 10(d) states as follows:

> Mezzanine Lender shall not challenge the validity or amount of any claim submitted in such Proceeding by Senior Lender in good faith or any valuations of the Premises or other Senior Loan collateral submitted by Senior Lender in good faith, in such Proceeding or take any other action in such Proceeding, which is adverse to Senior Lender's enforcement of its claim or receipt of adequate protection (as that term is defined in the Bankruptcy Code).

Taken as a whole, the provision attempts to prohibit SREI from challenging Legg Mason's assertion of secured claim rights in the Debtors' bankruptcy cases, or hindering Legg Mason's ability to enforce its claim against the Debtors.

Where, as here, the Joint Plan drafted by SREI provided Legg Mason with the opportunity to credit bid the full amount of its secured claim, it does not appear SREI took any action adverse to Legg Mason's "enforcement" of its claim. Legg Mason's claims were not disputed by any of the parties and SREI did not otherwise take any action adverse to the enforceability of Legg Mason's claim. In fact, through SREI's efforts in drafting and confirming a consensual plan, Legg Mason was able to acquire its collateral and "enforce" its claim through a pre-approved sale process.

SREI's assertion of its entitlement to an award for substantial contribution is not adverse to nor does it hinder the enforcement of Legg Mason's Claim. Legg Mason exercised its option

pursuant to the Joint Plan to purchase the property for the entire amount of its claim, which also included the added obligation to pay all allowed administrative expense claims. *See* Sale Order ("in consideration for the sale of the Sale Assets, Legg Mason shall pay to Trustee Dillworth, in cash, certified check, or wire transfer, a sum sufficient to satisfy all allowed administrative expenses as provided in the Confirmation Order and Plan").

Had Legg Mason instead declined the opportunity to purchase the Property under the Joint Plan, it would have had an opportunity to credit bid and enforce its claim at the contemplated auction sale without the obligation to pay all allowed administrative expense claims. The fact that SREI is now seeking allowance of its fees and expenses as an administrative expense claim against the Debtors' estates, which incidentally will be paid by Legg Mason if allowed (pursuant to Legg Mason's contractual obligations under the Joint Plan), does not affect the enforceability of Legg Mason's claim, as Legg Mason's claim was extinguished when it credit bid the full value of its claim in connection with its acquisition of the Property from the Chapter 11 Trustee. Accordingly, the Court finds the Inter-creditor Agreement does not bar SREI's claim for an administrative expense.

**B. SREI'S SUBSTANTIAL CONTRIBUTION TO THE REORGANIZATION**

Legg Mason further argues that SREI has not established that it made a substantial contribution to the estates so as to justify an award of an administrative expense claim. Pursuant to 11 U.S.C. § 503(b)(3)(D), actual and necessary expenses incurred by a creditor, indenture trustee or equity security holder for making a "substantial contribution" to a Chapter 11 case may be compensated as an administrative expense. An entity that made a "substantial contribution" to a Chapter 11 case is entitled to reasonable compensation "based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case

under this title, and reimbursement for actual, necessary expenses incurred by such attorney...."
11 U.S.C. 503(b)(4). The criteria for determining whether an entity has made a "substantial
contribution," are not defined by the Bankruptcy Code. *See In re Celotex Corp.*, 227 F.3d 1336,
1338 (11th Cir. 2000).

The Eleventh Circuit takes a results-oriented approach to determining whether a party has
made a substantial contribution to a Chapter 11 case, placing greater weight on the value of a
creditor's contribution than on its motivation or intent for making the contribution. *Celotex*, 227
F.3d at 1339 citing *In re DP Partners, Ltd.*, 106 F.3d 667, 673 (5th Cir. 1997). In *Celotex*, the
first case in this Circuit to evaluate this standard, the Court relied on the *DP Partners* decision in
adopting the results oriented approach followed by the Fifth Circuit. *Id.* at 1340. The Court
found that the creditor made a substantial contribution for its tireless contribution over a number
of years in developing a plan that provided tangible and demonstrable benefits to the estate. It
noted that these contributions were made under "phenomenally unique" circumstances. The
Court refrained, however, "from defining with specificity what constitutes a substantial
contribution" *Id.*

Factors the *Celotex* court considered in its decision have been applied to develop a three-
prong analysis used for determining a substantial contribution. The creditor's actions must have
"(1) "directly and demonstrably benefit" the estate... (2) "foster and enhance, rather than retard
or interrupt the progress of the reorganization,"... and (3) be "considerable in amount, value or
worth." *In re United Container LLC*, 305 B.R. 120, 126 (Bankr. M.D.Fla. 2003) citing *In re
Kidron*, 278 B.R. 626, 632-33 (Bankr. M.D.Fla. 2002). This analysis emphasizes the value of,
and not the motivation behind, the creditor's contribution to the resolution of the Chapter 11
case. *Celotex* 227 F.3d at 1339; *United Container LLC*, 305 B.R. at 126 citing *In re Pow Wow*

*River Campground*, 296 B.R. 81, 86-87 (Bankr. D.N.H. 2003). Contributions are not substantial if evidence shows that the creditor's contribution primarily benefitted itself and only provided an incidental benefit to the estate. *In re New Power Co.*, 311 B.R. 118, 124 (Bankr. N.D.Ga. 2004) citing *Kidron*, 278 B.R. at 633.

The Court must weigh the cost of the claimed fees and expenses against the benefits to the estate which flow directly from those actions. *Pow Wow*, 296 B.R. at 86. Actions which only benefit a portion of the estate or a limited class of creditors are necessarily diminished in weight. *Id.* citing *DP Partners*, 106 F.3d at 673.

A creditor is afforded allowed administrative expense priority when it demonstrates value to the estate through its extraordinary efforts that foster and considerably enhance the estate's assets. *Kidron*, 278 B.R. at 633. These "extraordinary" efforts should be motivated by "special and unusual circumstances" to qualify as a substantial contribution under section 503(b)(3)(D). "Typical and ordinary" expenses are not substantial contributions. *Id.*

In *Kidron*, "strange and unusual" circumstances were created in an asset sale when an unusually close relationship between the Debtors and a "stalking  horse" bidder hindered the flow of information to potential bidders who were operating under an unusually compressed deadline. 278 B.R. at 633. The court labeled efforts by the moving creditor to even the "playing field" between bidders to allow for an auction as "extraordinary." These efforts increased the sale price of the debtor's assets by an amount exceeding the "stalking horse" bid by $2 million. *Id. See also DP Partners*, 106 F.3d at 670 (substantial contribution by a creditor to the estate whose work lead to the discovery of litigation over a potentially fraudulent transfer and participation in a confirmation fight resulted in at least a $3 million benefit to all creditors of the estate); *In re McLean Industries, Inc.*, 88 B.R. 36, 39 (Bankr. S.D.N.Y. 1988) (creditor whose

actions resulted in an increase of $1.150 million in proceeds for the estate made a substantial contribution); *United Container*, 305 B.R. at 124 (creditors made a substantial contribution where their efforts lead to the recovery of about $13.5 million of the approximately $14.6 in assets collected by the estate; *Pow Wow*, 296 B.R. at 88-89 (substantial contribution for efforts resulting in a 100 percent dividend plus fast confirmation of a plan).

Legg Mason contends the efforts undertaken on behalf of SREI in connection with the Joint Plan appear to have been motivated by SREI's desire to save it from having to pay certain amounts to Legg Mason, as the real estate lender. Under Phase II of the Plan, SREI (and only SREI) would be entitled to cure defaults under the Legg Mason Mortgage without payment of any default interest or late fees, as otherwise would have been required under the agreement with Legg Mason. Had SREI performed (which it did not), Legg Mason states SREI would have saved itself hundreds of thousands of dollars, the spread between contract rate interest and default rate interest, a difference of approximately $769,000. Thus, Legg Mason asserts the work undertaken by SREI's counsel appears to have been motivated primarily by its own interests.

The Court does not believe SREI's motivation bars an administrative claim. It is not a factor relied upon by the Eleventh Circuit and is not determinative of the issue before the Court. As recognized by the Court in *Celotex*, "it is difficult to imagine a circumstance in which a creditor will not be motivated by self interest in a bankruptcy proceeding" such that imposing a disinterestedness requirement upon creditors before they are eligible to seek administrative expenses for substantial contributions to a Chapter 11 case under sections 503(b)(3)-(4) would "effectively render the section meaningless as to creditors." 227 F.3d at 1339. Further, "examining a creditor's intent unnecessarily complicates the analysis of whether a contribution of

considerable value or worth has been made" to the reorganization. *Id.* Therefore, the Eleventh Circuit adopted the Fifth Circuit's holding in *DP Partners* "'that a creditor's motive in taking actions that benefit the estate has little relevance in the determination whether the creditor has ... ma[de] a substantial contribution to a case.'" *Id.* citing *DP Partners*, 106 F.3d at 673.

Likewise, the fact that the Trustee and his counsel and Legg Mason and its attorneys *could have* proposed a plan providing for tax savings is irrelevant, as that work was not performed by those parties but rather SREI and its counsel. In either event, time would necessarily have been expended for services which are reimbursable. Thus, in determining whether a substantial contribution has been made, a court focuses on whether the efforts "directly and materially contribute to the reorganization." *Celotex Corp.*, 227 F.3d at 1339; *see also In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988) (test is "whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors.").

The burden of proof as to the substantial benefit rendered to the estate is on the applicant, and the entitlement to an award must be established by a preponderance of the evidence. *In re Buttes Gas & Oil Co.*, 112 B.R. 191, 193 (Bankr.S.D.Tex.1989). The burden of production then shifts to the objector after the applicant has presented a prima facie case. *In re Gulf Coast Orthopedic Center, Inc.*, 283 B.R. 335, 340 (Bankr.M.D. Fla. 2002). Corroborating testimony by a disinterested party attesting to a claimant's instrumental acts has proven to be a decisive factor in awarding compensation to activities which otherwise might not constitute a "substantial contribution". *In re U.S. Lines, Inc.*, 103 B.R. 427, 430 (Bankr. S.D. N.Y. 1989)(citations omitted). Absent, or in addition to, such corroborating testimony, a court's own first hand observance of the services provided may be a sufficient basis on which to find a "substantial contribution." *Id.* (citations omitted).

1. **Plan and Disclosure Statement**

SREI seeks reimbursement solely for the legal fees and costs expended by its counsel in formulating, drafting and negotiating the Joint Plan and Joint Disclosure Statement. Where a creditor seeks reimbursement for its fees and expenses incurred in formulating, drafting, and negotiating a plan of reorganization, in addition to the requirement that a tangible benefit be conferred on the creditors, debtor, or the estate, the Eleventh Circuit has recognized and adopted a "but-for" test to determine whether a "substantial contribution" has been made. The Court stated:

> We refrain today from defining with specificity what constitutes a substantial contribution. We do find, however, that where, as here, evidence supports the conclusion that without [the creditor's] efforts a reorganization plan may not have been achieved, a substantial contribution has been demonstrated.

*Celotex*, 227 F.3d at 1340; *see also In re Encapsulation Int'l, Inc.*, 1998 WL 801898 at *4 (Bankr. W.D. Tenn. 1998) ("confirmation prospects took a positive turn when [the applicant's counsel] drafted what would become a joint disclosure statement and engaged in meaningful negotiations with the debtor's attorney that resulted in a consensual plan of liquidation . . . [Counsel's] efforts . . . brought the debtor and the principal creditors to the point of agreement that appears to be the only achievable path that would result in a confirmed plan rather than a dismissal or conversion of the case-the consensual path.").

SREI took the initiative, prompting the Chapter 11 Trustee to approve and rely on SREI's counsel in the drafting and negotiating the Joint Plan and Joint Disclosure Statement. Until SREI prepared and filed the Joint Plan and Joint Disclosure Statement, no other plan emerged that was capable of being approved, given the failed prior attempts by the Debtors and the equity security holders.

SREI undertook the task of co-drafting a plan of reorganization with the Chapter 11 Trustee and proffered the Joint Plan that was confirmed. Unlike the creditors seeking allowance of administrative expenses and fees in the *Consolidated* case, SREI did not act as a lone entity with no cooperation or input from the Chapter 11 Trustee. *See Consolidated*, 785 F.2d at 1254 ("the conduct of activities parallel to but not coordinated with those of an official committee, wholly outside of supervision by the bankruptcy court and scrutiny by the debtor and other officially appointed professionals, cannot be compensated."). To the contrary, the Chapter 11 Trustee was aware of SREI's actions and agreed that SREI could undertake the laboring ore in drafting the Joint Plan, together with the Joint Disclosure Statement, to move the progress of the case towards confirmation and closure.

Drafting a confirmed plan at the request of and with the consent of an estate professional evidences a contribution to the estate, particularly where the plan is confirmed. Drafting the Joint Plan and Disclosure Statement alleviated the concomitant burden on the Chapter 11 Trustee to draft the Joint Plan and Joint Disclosure Statement. The time and expense to draft the Joint Plan and Disclosure Statement was inevitably to be borne by the Debtors' estates, and counsel for SREI provided a benefit to the estates by providing such services. *See In re Worldwide Direct, Inc.*, 334 B.R. 112, 123 (Bankr. D. Del. 2005) (awarding substantial contribution claim of indenture trustee in drafting portion of the plan at the request of creditor's committee, because "in the absence of [trustee counsel's] involvement, counsel for the Committee or the Debtors would have had to do that work, at the expense of the estate"); *see also In re Essential Therapeutics, Inc.*, 308 B.R. 170, 176 (Bankr. D. Del. 2004) (finding substantial contribution where "drafting key plan provisions, participating in hearings, and providing assistance during the reorganization

process the [applicants] lessened the burden on the Debtors' professionals and expedited a smooth transition through the bankruptcy process.").

Although it has been argued that "the mere participation in the negotiation, drafting and confirmation of the plan is not sufficient" evidence of a substantial contribution, *In re Granite*, 213 B.R. at 449 citing *In re Baldwin-United Corp.*, 79 B.R. 321, 340-41 (Bankr. S.D. Ohio 1987), the Court finds that where such participation, negotiation and drafting is done jointly with an estate professional, such as the Chapter 11 Trustee, either at its request or with its consent, there is a strong presumption that a "substantial contribution" has been made by such creditor, subject to the Court's duty to independently examine the fees and expenses of the applicant to determine reasonableness.

Counsel for SREI is well known and respected by this Court and the other professionals in this case, as evidenced by statements made at the December 23, 2008 hearing. The previous attempts by the Debtors and the equity security holders to file plans and disclosure statements did not result in any benefit to the estates because they were heavily contested and were never confirmed. With the help of SREI, however, the Chapter 11 Trustee was able to confirm a plan of reorganization that contemplated every possible scenario related to the divestiture of the Debtors' property interests. In fact, the Chapter 11 Trustee was able to smoothly move through each phase of the Joint Plan ultimately transferring the Property to Legg Mason and receiving funds sufficient to pay all of the administrative claims in full. As a result, the Court finds that SREI's contributions in drafting and negotiating the Joint Plan and Joint Disclosure Statement fostered and enhanced these Chapter 11 cases, and as such, are deemed by the Court to be a substantial contribution to these Chapter 11 cases.

2. **Tax Savings to the Estate and Administrative Claims**

Having determined SREI's contribution to the Debtors' estates by jointly formulating, drafting and negotiating the plan and disclosure statements alleviated the administrative burden on the Chapter 11 Trustee in these cases, the Court will address the issue of whether any further benefit was conferred on the estate based on the savings of transfer taxes associated with a sale of the Property under the Joint Plan and payment of the entire allowed administrative expense claims by the purchaser of the Property, Legg Mason.

In the state of Florida, documentary stamp tax is levied on documents as provided under Chapter 201, Florida Statutes, including deeds, bonds, notes and written obligations to pay money, mortgages, liens, and other evidences of indebtedness. The tax rate for documents that transfer an interest in real property is $.70 per $100 (or portion thereof) of the total consideration paid, or to be paid, for the transfer. An exception exists in Miami-Dade County, where the rate is $.60 per $100 (or portion thereof) when the property is a single-family residence. If the Miami-Dade property is anything other than a single-family residence, the tax rate is $.60 plus $.45 surtax per $100 (or portion thereof). The Property conveyed to Legg Mason is not a single-family residence and therefore is subject to the additional $.45 surtax, resulting in a total transfer tax of $1.05 per $100 transferred.

To the extent that the Property was transferred at the total value estimated in the Sale Order of $24,000,000, the transfer taxes that were saved by the estate amount to $252,000. If the value of the transferred Property is set at the assessed value for property tax purposes of $12,000,000, then the transfer taxes saved by the estate would be $126,000.

To be compensable under section 503(b)(3)(D), post-petition efforts must result in an actual and demonstrable benefit to the bankruptcy estate. *Consolidated Bancshares*, 785 F.2d at 1253. While an award of compensation does not necessarily depend on the confirmation of a

proposed plan of reorganization, *In re Russell Transfer, Inc.*, 59 B.R. 871, 872 (Bankr.W.D.Va.1986), only reorganization efforts directly benefiting the estate will be compensated. SREI's efforts resulted in a benefit to the Debtors' estates by significantly reducing the liability that would have been incurred by the Debtors' estates if the Property had been sold outside of a confirmed plan, based upon the exemption from transfer taxes allowed to a transaction under a confirmed plan pursuant to section 1146(a) of the Bankruptcy Code.

The Court is persuaded, given the current real estate market, and the limited prospects these Debtors had to successfully reorganize, that avoidance of tax liability provided to the estate by confirming the Joint Plan was one of the few benefits that could have been conferred upon these estates.  Since the Debtors, and then later the Chapter 11 Trustee, had been actively marketing the property at an amount sufficient to pay the claims of all creditors in these estates ($27,000,000), with no real ability to close a sale, despite discussions with several interested buyers, the Court is of the opinion that the transfer tax liability of the estates that was avoided by the confirmation of the plan was a sufficient benefit to the estates, the Debtors and their creditors.

The fact that Legg Mason ultimately agreed to contribute funds sufficient to pay all allowed administrative claims of the estates pursuant to the Joint Plan does not diminish the benefit that was provided to the estates by avoidance of the transfer tax liability.  Without the Joint Plan being confirmed, primarily as a result of the time spent by counsel for SREI in formulating, drafting and negotiating the Joint Plan, the Debtors' estates would have been liable for the additional expense ranging from $126,000 to $252,000 (conservatively) if a sale was consummated outside of the confirmed Joint Plan.

Legg Mason argues that the Debtors' Plan would have accomplished the same result since it originally contemplated a sale at auction of the Property or a transfer of the Property back to Legg Mason in accordance with its secured creditor rights. Legg Mason further argues that SREI only benefitted itself by adding in Phase II to the Joint Plan to allow SREI to safeguard its secured rights. Legg Mason's arguments ignore the fact that the Chapter 11 Trustee consented to and joined in the Joint Plan and Joint Disclosure statement drafted by SREI, not the plan formulated by the Debtors. Also, it should be noted that Legg Mason cooperated with the Chapter 11 Trustee and SREI when provided the opportunity to comment on the Joint Plan, evidencing the fact that SREI facilitated the confirmation of a consensual plan of reorganization among the creditor constituencies. [December 23, 2008 Hearing, SREI Ex. 1, Email between counsel for Legg Mason and SREI].

Although "benefits flowing to only a portion of the estate or to limited classes of creditors are diminished in weight," *In re D.P. Partners*, 106 F.3d at 673, they are not completely ignored, especially, in cases such as these where any real prospect of reorganization is bleak. Because of the Joint Plan, administrative creditors and the estates' largest secured creditor were paid in full. If Legg Mason had not exercised its option to purchase the Property by way of credit bid and contribution of funds to pay all allowed administrative claims, then Legg Mason's only other options would have been to foreclose on the Property in state court, without the benefit of payment to administrative expense claimants, or credit bid its secured claim at an auction outside of the plan context; again, without any assurance that administrative expense claimants would be paid in full. Further given the range of tax savings afforded the estates and the reasonable cost of preparing the Joint Plan and Joint Disclosure Statement, which would have been incurred by the Chapter 11 Trustee if not undertaken by SREI, Legg Mason's suggestion that SREI did not make

a substantial contribution is without merit.  The fees and expenses incurred by SREI to jointly confirm the Joint Plan, with the Chapter 11 Trustee, and thereby satisfy two of the largest classes of creditors, provided a substantial contribution to the estates, notwithstanding that no distribution to creditors was expected.

An evidentiary record is required to find a creditor made a substantial contribution. *In re Sanders Grain Farms*, 2007 WL 1381407, *3 (Bankr. D.Idaho 2007).  The Court believes the Applicant must more definitely prove the contribution it made to the estates so that the Court may determine whether the amount requested by SREI is reasonable under the circumstances.  As the court noted in *Sanders Grain Farms,* confirming a plan is not a per se benefit to the estate.  *Id.* The Court does not know what the true tax savings amount is and whether the fees and costs requested are reasonable in light of those savings.

Accordingly, it is

ORDERED, ADJUDGED AND CONCLUDED that SREI-Miami, LLC's Application for Administrative Expenses Claim Pursuant to 11 U.S.C. Section 503(b) [D.E. 650] is GRANTED in part and Applicant is entitled to an administrative expense claim, in an amount yet to be determined.  An evidentiary hearing is scheduled for _May 13_ , 2009 at _3 :00_ AM/PM in Courtroom 1410, 51 SW First Ave, Miami, FL, to provide Applicant the opportunity to more definitely prove the contribution it made to the estates so that the Court may determine whether the amount requested by SREI is reasonable under the circumstances.

# # #

**Copies furnished to:**

Raymond V. Miller, Esq.
Mindy Mora, Esq.
Drew Dillworth, Esq., Chapter 11 Trustee
*(Attorney Mora is directed to serve a copy of this Order upon all interested parties.)*